[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-12012

_____

D. C. Docket No. 98-06056-CV-JAL

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 24, 2009
THOMAS K. KAHN
CLERK

MICCOSUKEE TRIBE OF INDIANS OF FLORIDA,

FRIENDS OF THE EVERGLADES,

Plaintiffs-Appellants,

UNITED STATES ARMY CORPS OF ENGINEERS, et al.,

Intervenor-Plaintiffs,

versus

SOUTH FLORIDA WATER MANAGEMENT DISTRICT,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(February 24, 2009)

Before DUBINA and CARNES, Circuit Judges, and GOLDBERG,[*] Judge.

CARNES, Circuit Judge:

This is a tale of two cases, one of which is before us in this appeal. The cases are six and eleven years old and together have generated more than twelve hundred docket entries in the district court. One case has been to the Supreme Court, where it was remanded back to us, and then we sent it along to the district court in 2004; the other one went to trial for two months in 2006. The two cases have a lot in common.

They share the same plaintiffs (the Miccosukee Tribe and the Friends of the Everglades) and the same defendant (the South Florida Water Management District), and they both present the issue of whether the Clean Water Act requires the Water District to obtain National Pollution Discharge Elimination System (NPDES) permits for its pump stations. One lawsuit, the "S-2 case," claims that permits are required for pump stations S-2, S-3, and S-4, which move polluted water from the Everglades Agricultural Area canals into Lake Okeechobee. The present lawsuit, the "S-9 case," claims that a permit is required for pump station S-

---

9, which moves polluted water from the C-11 canals into Water Conservation Area 3A (WCA-3A).

After the S-2 case was tried to final judgment in 2006, the district court stayed its proceedings in the S-9 case pending appeal of the S-2 judgment. The appeal of the S-2 judgment is still pending in this Court. See Friends of the Everglades, Inc. v. S. Fla. Water Mgmt. Dist., 2006 WL 3635465 (S.D. Fla. Dec. 11, 2006), No. 07-13829 (appeal docketed Aug. 13, 2007).

This appeal challenges the stay order that the district court on its own motion entered in the S-9 case pending the outcome of the appeal in the other case. The first, and as it turns out, the last issue we need to address is whether we have jurisdiction to review the stay order under 28 U.S.C. § 1291. The jurisdiction question requires us to decide whether the stay order in this case put the plaintiffs "effectively out of court" and whether the collateral order doctrine applies here.

**I.**

**A.**

This case was filed in the district court in January 1998. The Friends of the Everglades and the Miccosukee Tribe sued the Water District,[1] contending that its

---

[1] The Miccosukee Tribe and Friends of the Everglades initially filed separate lawsuits against the Water District, but the cases were consolidated in May 1998.

S-9 pump station required an NPDES permit. In 1999 the district court granted summary judgment to the plaintiffs because the court found that the S-9 pump qualified as a point source and moved polluted water from one distinct water body into another. Miccosukee Tribe of Indians v. S. Fla. Water Mgmt. Dist., 1999 WL 33494862, at *7 (S.D. Fla. Sept. 30, 1999). We affirmed the district court's ruling on the Clean Water Act issue. Miccosukee Tribe of Indians v. S. Fla. Water Mgmt. Dist., 280 F.3d 1364, 1371 (11th Cir. 2002).

The Supreme Court granted review and decided that the S-9 pump was a point source under the Clean Water Act. The Court, however, did not decide whether the C-11 canals and WCA-3A were "meaningfully distinct" water bodies. See S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians, 541 U.S. 95, 112, 124 S. Ct. 1537, 1547 (2004). Instead, the Court remanded the case for further factfinding on that point and for consideration of the Water District's "unitary waters" argument. Id. Under the unitary waters theory all navigable waters are considered to be one body of water, so that moving a pollutant from one navigable water to another would not amount to the "addition of a pollutant to the navigable waters" under the Clean Water Act. Id. at 107–09, 124 S. Ct. at 1543–45. If that theory holds water, the Water District would not need an NPDES permit even if the water conservation area and the canals were meaningfully distinct water

bodies.  Id.  We remanded the case to the district court for further proceedings in November 2004.  It has been pending there ever since.

**B.**

The parallel S-2 case, which concerns whether the Water District's other pumps (S-2, S-3, and S-4) require an NPDES permit, was filed by the same plaintiffs (and some others) against the same defendant in 2002.  The proceedings in the S-2 case were stayed for nineteen months until the Supreme Court's decision in the S-9 case was issued.  See Miccosukee, 541 U.S. 95, 124 S. Ct. 1537.  Then the S-2 case was re-opened.

In January 2006 the S-2 case went to trial, which lasted nearly two months and involved more than a dozen expert witnesses and one hundred and fifty exhibits.  The district court issued a 107-page ruling concluding that the Everglades Agricultural Area canals and Lake Okeechobee— the water bodies connected by the S-2, S-3, and S-4 pumps— were meaningfully distinct water bodies, and that the pumps required an NPDES permit because they moved pollutants from the canals into the Lake.  Friends of the Everglades v. S. Fla. Water Mgmt. Dist., 2006 WL 3635465, at *51 (S.D. Fla. Dec. 11, 2006).  In the course of reaching that conclusion, the court rejected the Water District's unitary waters theory.  Id. at *43.

5

## C.

Meanwhile, this case—back from its trip to the Supreme Court— was being handled in the same district by a different judge.   In light of the S-2 decision, and without a request from the parties, she issued a stay in this case.  The stay order stated that "it is extremely likely that an appeal is forthcoming in [the S-2 case], which is much further along in its proceedings than the instant [S-9] case."  The order noted "extensive similarities" between the issues in the cases and found that "the interests of justice and judicial economy, including avoiding inconsistent results, the duplication of efforts, and the waste of judicial resources, will be promoted by granting a stay of this proceeding."  Unless extended by written order, the stay was to expire after one year or at the conclusion of the appeals of the S-2 case, whichever came first.[2]  This is the Miccosukee Tribe and the Friends of the Everglades' appeal from the stay order.

## II.

The Friends of the Everglades and the Miccosukee Tribe contend that the district court abused its discretion in entering the stay.  The Water District contends that we lack jurisdiction to decide that.  Jurisdiction is a threshold issue.

---

[2]  The initial stay was issued in March of 2007.  In July 2008, the plaintiffs filed a notice that the stay had lapsed and requested a trial.  The district court instead renewed the stay for one more year under the same terms as the first one.

See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist., ___ U.S. ___, 127 S. Ct. 2738, 2750 (2007); King v. Cessna Aircraft Co., 505 F.3d 1160, 1165 (11th Cir. 2007).

The key provision, 28 U.S.C. § 1291, states: "The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States . . . ." Ordinarily a stay order is not a final decision for purposes of § 1291. Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 10 n.11, 103 S. Ct. 927, 934 n.11 (1983) ("[T]he usual rule [is] that a stay is not ordinarily a final decision for purposes of § 1291, since most stays do not put the plaintiff 'effectively out of court.'"). Using a "practical construction" of finality, however, the Supreme Court has blazed through the jurisdictional thicket several paths by which a stay order may be considered a final decision. See Swint v. Chambers County Comm'n, 514 U.S. 35, 41–42, 115 S. Ct. 1203, 1207–08 (1995) (referring to the collateral order doctrine "not as an exception to the 'final decision' rule laid down by Congress in § 1291, but as a 'practical construction' of it" (citations omitted)). Our plaintiffs, the Friends of the Everglades and the Miccosukee Tribe, contend that two of those practical construction paths can get them to the higher ground of appellate jurisdiction.

## A.

The first of those paths, according to the plaintiffs, is the one staked out in Idlewild Bon Voyage Liquor Corp. v. Epstein, 370 U.S. 713, 715 n.2, 82 S. Ct. 1294, 1296 n.2 (1962), which recognized that a stay leaving a party "effectively out of court" is a final order appealable under § 1291. See also Cessna Aircraft, 505 F.3d at 1165–66.

Ordinarily a party is "effectively out of court" when a federal court stays its hand pending the conclusion of related state court or state administrative proceedings. See Idlewild, 370 U.S. at 715, 82 S. Ct. at 1296 (holding that abstention under the Pullman doctrine to allow a state court to interpret and clarify state law put plaintiff effectively out of court); Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 116 S. Ct. 1712 (1996) (holding that a remand order under the Burford abstention doctrine to allow a state administrative agency to decide the issue put plaintiff effectively out of court); Moses H. Cone, 460 U.S. at 10–13, 103 S. Ct. at 934–35 (holding that a stay granted under the Colorado River abstention doctrine to allow a state court to address the central issue of the lawsuit put plaintiff effectively out of court).

The Idlewild, Moses H. Cone, and Quackenbush decisions establish the foundation of the "effectively out of court" finality rule. See Cessna Aircraft, 505

8

F.3d at 1166–68.  Concerns about protecting federal court decisional authority underlie all three of those decisions.  Moses H. Cone, 460 U.S. at 10 n.11, 103 S. Ct. 934 ("Idlewild's reasoning is limited to cases where . . . the object of the stay is to require all or an essential part of the federal suit to be litigated in a state forum."); Quackenbush, 517 U.S. at 714, 116 S. Ct. at 1719 (noting that the remand to state court was "precisely to surrender jurisdiction of a federal suit to a state court.").

Even though the effectively out of court doctrine has its roots in concerns about federal courts' surrendering decisional authority to state courts, its branches have spread beyond that.  In a handful of cases we have found jurisdiction to review orders granting stays pending litigation in non-state forums, including the Italian courts in Cessna Aircraft, 505 F.3d at 1169; the Iran-United States Claims Tribunal in CTI-Container Leasing Corp. v. Uiterwyk Corp., 685 F.2d 1284 (11th Cir. 1982); and the EEOC in Hines v. D'Artois, 531 F.2d 726 (5th Cir. 1976).[3] See also Ortega Trujillo v. Conover & Co. Commc'ns, Inc., 221 F.3d 1262 (11th Cir. 2002) (jurisdiction assumed where stay granted pending litigation in the Bahamian courts).

---

[3] In our en banc decision in Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

9

The Cessna Aircraft case stemmed from an airplane collision in Italy. 505 F.3d at 1163. The district court stayed an American plaintiff's lawsuit to await the Italian courts' resolution of whatever issues might be raised in future litigation there. Id. at 1163–64. Even though the stay had not been issued in favor of a state court, we explained that the "differences between federalism and international comity . . . . do not, however, affect the extent to which a plaintiff is placed 'effectively out of court,' which is the measure that defines our appellate jurisdiction over stay orders." Id. at 1169–70. The plaintiff in Cessna Aircraft was effectively out of court under Idlewild and Moses H. Cone because that doctrine applies "when a federal court stays its hand to allow another [type of] court to assume partial jurisdiction over the merits of the suit." Id. at 1169. See also Moses H. Cone, 460 U.S. at 9 n.8, 103 S. Ct. at 933 n.8 (effectively out of court means "out of *federal* court—in keeping with the fact that the decision under appeal is the refusal to exercise *federal* jurisdiction").

The present case is unlike the traditional effectively out of court cases because this stay was not issued pending the conclusion of state court or administrative proceedings, and it is unlike Cessna Aircraft because the stay was not issued pending foreign court proceedings. It was issued pending the outcome of other litigation in federal court—the appeal of a lawsuit filed in the same

10

district court. The Southern District of Florida simply had two lawsuits raising some potentially dispositive issues common to both. After one judge entered judgment in the case before her, the second judge stayed her case to await the outcome of an appeal of that final judgment. To the extent jurisdiction was "surrendered" to any court, see Quackenbush, 517 U.S. at 714, 116 S. Ct. at 1719, it was not to a state court or to a foreign court. Instead, it was surrendered to this Court, the same one that would decide any appeal from any final judgment in the stayed case, if the proceedings had not been stayed.

Our plaintiffs are not being forced to litigate their case in a non-federal court in derogation of the federal courts' "virtually unflagging obligation . . . to exercise the jurisdiction given them." Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817, 96 S. Ct. 1236, 1246–47 (1976). The Supreme Court noted in Colorado River that "as between state and federal courts, the rule is that the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction . . . . As between federal district courts, however, though no precise rule has evolved, the general principle is to avoid duplicative litigation." 424 U.S. at 817, 96 S. Ct. at 1246 (citations omitted). Avoiding duplicative federal litigation is the reason the stay was entered in this case. Because it does not require the federal court

11

plaintiffs to await a decision from a non-federal court or other tribunal, they have not been put effectively out of court in the traditional way.

The plaintiffs argue, however, that they can satisfy the effectively out of court doctrine by showing that their case has been placed in an "extended state of suspended animation" even though it was suspended to await the result of another federal court action. See Hines, 531 F.2d at 730.

In Hines the plaintiffs sued representatives of the Shreveport police under § 1981 and Title VII seeking redress for "a broad range of racially discriminatory practices" in the police force. 531 F.2d at 728. The district court stayed the case until the plaintiffs pursued their EEOC remedies under Title VII. Id. at 728–29. The stay would have put the federal court proceedings—including the statutorily independent § 1981 claims for which there was no EEOC remedy—on hold for anywhere from one and a half to five and a half years. Id. at 731–32. The Hines Court characterized the result as "an extended state of suspended animation," id. at 730, imposed without any "reasonable possibility that the EEOC conciliation efforts [would] be productive." Id. at 731. It concluded that in those circumstances the stay had put the plaintiffs effectively out of court. "For the purposes of expedition and certainty, the parties here would have been served just as well by a stay pending the arrival of Godot." Id. at 731–32. Although Hines

12

pre-dated the clear distinction between the Idlewild (effectively out of court) and Cohen (collateral order) doctrines, we have since applied Hines' "suspended animation" concept as part of the effectively out of court doctrine in Am. Mfrs. Mut. Ins. Co. v. Stone, 743 F.2d 1519, 1524 (11th Cir. 1984).

It cannot be, however, that any state of suspended animation places a plaintiff effectively out of court and confers appellate jurisdiction under § 1291. If that were the case, then every stay would be an appealable final order because every stay suspends the animation of a case. And we know that not every stay is appealable. Moses H. Cone, 460 U.S. at 10 n.11, 103 S. Ct. at 934 ("[A] stay is not ordinarily a final decision for purposes of § 1291, since most stays do not put the plaintiff 'effectively out of court.'"). The plaintiffs' argument sweeps too much into its net.

The suspended animation cases in which the stay has been held to be appealable, and there are only four,[4] all share one characteristic that the present case lacks. They all involved stays resulting in indefinite delays pending the outcome of proceedings that were unlikely to control or to narrow substantially the claims or unresolved issues in the stayed lawsuit. See Hines, 531 F.2d at 736–37

---

[4] Arguably there are only three of them; Cessna Aircraft does not cite the "suspended animation" formulation of Hines, but could fall under it. 505 F.3d at 1163–70.

(holding that a stay of a lawsuit raising § 1981 claims pending an EEOC proceeding for distinct Title VII claims put the plaintiffs effectively out of court because the delay would last for years without any "reasonable probability that the EEOC conciliation efforts will be productive"); CTI, 685 F.2d at 1287–88 (holding that a stay in a case between two American companies to await action by the Iran-United States Claims Tribunal on the defendant's claim against Iran put the plaintiff effectively out of court in part because the defendant's claims against Iran were "contingent upon a finding in the district court"); Stone, 743 F.2d at 1523–24 (holding that a stay granted to await the outcome of related state-court litigation put the plaintiff effectively out of court because the parties agreed that "the state lawsuit will not decide the issues presented in [the plaintiff]'s federal claim," meaning that the federal case had been subjected to "an indefinite and unnecessary delay"); Cessna Aircraft, 505 F.3d at 1172 (holding that a stay issued to await proceedings in Italian court put the plaintiff effectively out of court in part because there was "no assurance at all that the Italian proceedings will directly relate to the issues in this lawsuit").

Effectively out of court by suspended animation is a narrow doctrine that applies only when a case is placed in an "extended state of suspended animation" without good reason. See Hines, 531 F.2d at 730. In Hines, CTI, Stone, and

14

Cessna Aircraft, the plaintiffs' federal claims languished for no good reason because there was little likelihood that the other forums' decisions would control or significantly inform the litigation.

In this case, however, the reason for the district court's stay was at least a good one, if not an excellent one: to await a federal appellate decision that is likely to have a substantial or controlling effect on the claims and issues in the stayed case. The central question in both the S-2 case and in this S-9 case is whether, under the Clean Water Act, the Water District must acquire NPDES permits for its enormous pumps. In one case some of those pumps move polluted water from canals into a water conservation area, and in the other case the pumps move polluted water from different canals into Lake Okeechobee. The central argument for the Water District, as supported by an EPA regulation, is the "unitary waters theory." If we accept that theory in the S-2 appeal, it will wash out the plaintiffs' S-2 case entirely and also will flood most of their S-9 case.[5] But if we reject the unitary waters theory, then the S-9 case would remain on dry ground and proceed to a determination of whether the canals and water conservation area involved in that case are "meaningfully distinct" water bodies. Even that finding,

---

[5] The plaintiffs have argued that the S-9 pump, unlike the S-2 pumps, also *adds* pollution in the form of turbidity. Though this issue would remain in the S-9 case regardless of the outcome of the S-2 case, it is only a small part of the S-9 case.

however, would be substantially guided by our determination in the S-2 case of what "meaningfully distinct" means and by our application of that standard to the canals and lake involved in it.

Because the S-2 and S-9 cases are so similar, it appears that the district court's stay was designed to provide the parties with a special deal in which they could get two outcomes for the price of one appeal. The plaintiffs, however, are not interested in that bargain and insist that they have a right to proceed immediately to trial with the S-9 case despite the pendency of an appeal in the S-2 case. But the effectively out of court doctrine, and its suspended animation component, do not clear a path to appellate review of whether they have that right.

**B.**

A second potential path to appellate jurisdiction is the collateral order doctrine. See Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 69 S. Ct. 1221 (1949). "To come within the 'small class' of decisions excepted from the final-judgment rule by Cohen, the order must [1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] be effectively unreviewable on appeal from a final judgment." Coopers & Lybrand v. Livesay, 437 U.S. 463, 468, 98 S. Ct. 2454,

16

2458 (1978); Carpenter v. Mohawk Indus., Inc., 541 F.3d 1048, 1052 (11th Cir. 2008).

The Supreme Court has insisted that each part of the Cohen test is "stringent," which keeps the doctrine "narrow and selective in its membership." Will v. Hallock, 546 U.S. 345, 349–50, 126 S. Ct. 952, 957–58 (2006) ("[W]e have not mentioned applying the collateral order doctrine recently without emphasizing its modest scope."); Digital Equip. Corp. v. Desktop Direct, Inc., 511 U.S. 863, 868, 114 S. Ct. 1992, 1996 (1994) ("The 'narrow' exception should stay that way and never be allowed to swallow the general rule that a party is entitled to a single appeal, to be deferred until final judgment has been entered. . . ." (citation omitted)). The reason for the stringency of the doctrine's requirements—for the narrowness and modesty of its reach—is the fear that a robust collateral order doctrine would "overpower the substantial finality interests § 1291 is meant to further: judicial efficiency, for example." Will, 546 U.S. at 350, 126 S. Ct. at 958.

Consistent with the Court's confinement of the collateral order doctrine, each part of the Cohen test is a critical condition for jurisdiction. Feldspar Trucking Co. v. Greater Atlanta Shippers' Ass'n., 849 F.2d 1389, 1392 (11th Cir. 1988) ("If any one criteria is not met, jurisdiction cannot be invoked. . . ."). In this

case, we need not address the first and third conditions because the second is not satisfied.

The second condition under Cohen is that the stay order must "resolve an important issue completely separate from the merits of the action." Moses H. Cone, 460 U.S. at 11, 103 S. Ct. at 934. A decision to grant a stay is "separate from the merits," but it must also raise an "important issue," which means that an important right is at stake. Id. The Supreme Court has observed that "[t]he importance of the right asserted has always been a significant part of our collateral order doctrine." Will, 546 U.S. at 352, 126 S. Ct. at 959 (quoting Lauro Lines S.R.L. v. Chasser, 490 U.S. 495, 502, 109 S. Ct. 1976, 1980 (1989) (Scalia, J., concurring)). The doctrine requires "a judgment about the value of the interests that would be lost through rigorous application of a final judgment requirement." Id. at 351–52, 126 S. Ct. at 959 (quoting Digital Equip. Corp., 511 U.S. at 878–79, 114 S. Ct. at 2001).

Examples of "important issues" significant enough to justify immediate appellate jurisdiction under the collateral order doctrine include denials of the defenses of absolute presidential immunity, qualified immunity, Eleventh Amendment immunity, and double jeopardy. Will, 546 U.S. at 352, 126 S. Ct. at

18

959.  In all of these cases, "a substantial public interest" existed in taking an immediate appeal.  Id. at 353, 126 S. Ct. at 959.

In Moses H. Cone the Court held that the stay order in that case involved a public interest important enough to satisfy the collateral order doctrine.  460 U.S. at 12, 103 S. Ct. at 935.  The lawsuit sought to compel arbitration in a contract dispute.  Id. at 7, 103 S. Ct. at 932.  Because a lawsuit between the same parties presenting the same question was already underway in state court, the district court stayed the federal  proceedings to await the state court's judgment.  Id.  Once the state court judgment was issued the federal court would have to give it res judicata effect, id. at 10, 103 S. Ct. at 934, and as a result meaningful federal review of the arbitration question would have been impossible.  The Court stated that there was  "no dispute that this order meets the second . . . [collateral order doctrine] criteria.  An order that amounts to a refusal to adjudicate the merits plainly presents an important issue separate from the merits."  Id. at 12, 103 S. Ct. at 934.

At first glance, it appears that any stay granted to await another court's controlling resolution of shared issues would "amount[] to a refusal to adjudicate the merits," meeting the Moses H. Cone requirement of an important issue for Cohen purposes.  On second glance, however, the federal court's stay in Moses H.

19

Cone meant that a state court would resolve the issue. 460 U.S. at 35, 103 S. Ct. at 947 (Rehnquist, J., dissenting) ("The issue here was whether the factual question whether there was an agreement to arbitrate should be adjudicated in a state or federal court."). The Supreme Court later clarified the distinction when it stated in Quackenbush: "We determined [in Moses H. Cone] that a stay order based on the Colorado River doctrine presents an important issue separate from the merits because it amounts to a refusal to adjudicate the case in federal court." 517 U.S. at 713, 116 S. Ct. at 1719 (quotation marks omitted).

In other words, a decision to grant a stay pending the outcome of other litigation may or may not be an important issue. In Moses H. Cone, the stay issue was "important" because it involved a federal court surrendering its jurisdiction over a case to a state court. That implicated the federal courts' "virtually unflagging obligation" to decide cases over which they have jurisdiction. Colorado River, 424 U.S. at 817, 96 S. Ct. at 1246. There is a sufficiently strong public interest in federal courts exercising their jurisdiction when it exists to place Moses H. Cone in the company of other important issue cases, such as those involving the denial of immunity and double jeopardy defenses.

The stay in this case does not present an "important issue" as required by the collateral order doctrine. See Coopers & Lybrand, 437 U.S. at 468, 98 S. Ct. at

20

2458. There are no issues of federalism or international comity to add weight and finality to the district court's stay order. See Kershaw v. Shalala, 9 F.3d 11, 14 (5th Cir. 1993) ("[T]he Moses Cone exception should not apply[] where a district court enters an order staying its own proceedings in favor of other proceedings within the same federal judicial system."). Instead, in this case the plaintiffs assert, in effect, that there is a public interest in their being allowed to proceed with two federal lawsuits at the same time even though they raise common issues. Specifically, the plaintiffs want to proceed in the Southern District of Florida with their S-9 case while the appeal on the merits of their parallel S-2 case is pending in this Court. There is no "substantial public interest," Will, 546 U.S. at 353, 126 S. Ct. at 959, in their being allowed to do so.[6] Because the issue is not an important one within the meaning of Cohen's second condition, see Moses H. Cone, 460

_____

[6] Withholding decision in a case to await guidance from a higher court in a different case is not an unusual event. It happens with some regularity in the district courts, and from time to time we have done it ourselves. To give but one example, in Cunningham v. Billy, No. 07-10808, after oral argument we issued a notice that no decision would be forthcoming in that case until we had the benefit of the Supreme Court's decision in Dist. Atty's Office v. Osborne, 129 S. Ct. 488 (cert. granted Nov. 3, 2008).

Similarly, proceedings in the S-2 case were stayed by the district court in 2003 to await the Supreme Court's decision in the present case. See Miccosukee, 541 U.S. at 95, 124 S. Ct. 1537. That stay, which the Friends of the Everglades asked for, lasted nineteen months. At no time did any party assert that the stay had put them out of court or that there was a substantial public interest in pressing ahead in the S-2 case while the S-9 case was pending on appeal.

U.S. at 12, 103 S. Ct. at 934, that path to appellate jurisdiction is not open to the plaintiffs.

## III.

For all of these reasons, the Friends of the Everglades and the Miccosukee Tribe have not demonstrated that § 1291 or any of its "practical constructions" apply. We lack jurisdiction to hear the appeal of the district court's stay order.

**APPEAL DISMISSED FOR LACK OF JURISDICTION.**